## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Criminal Action Number** |
| | ) | **12-00283-02-CR-W-BCW** |
| Alvin Dixon, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is the MOTION TO SUPPRESS (Doc. #152) filed on April 22, 2013, by defendant Alvin Dixon ("Dixon"). On July 22, 2013, the undersigned held an evidentiary hearing on Dixon's motion. Dixon was present and represented by his counsel, Christine Blegen. The government was represented by Assistant United States Attorney Stefan Hughes. At the evidentiary hearing, testimony was given by two witnesses: Special Agents Matt Kenyon and Michael Alexander Menzel, both with the Federal Bureau of Investigation. Additionally, the following exhibits were admitted into evidence:

| Number | Description |
|---|---|
| Gov't. #1 | Arrest warrant |
| Gov't. #2 | Search warrant |
| Gov't. #3 | Property report |
| Gov't. #4 | Lab report |
| Gov't ##5-24 | Photographs |
| Gov't #25 | Arrest report |
| Def't #30 | Complaint |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

# PROPOSED FINDINGS OF FACT

1. As part of a drug trafficking investigation known as Operation Diamond Posse, an arrest warrant was issued by a Magistrate Judge on September 26, 2012 for Dixon and numerous other individuals. Tr. at 6-8; Gov't. #1.

2. During the investigation preceding the issuance of the arrest warrant, Matt Kenyon, a Special Agent with the FBI, had surveilled Dixon at a residence located at 10830 Beacon Avenue, Kansas City, Missouri, had seen Dixon driving a black GMC Sierra, and had determined that Dixon's driver's license listed the 10830 Beacon Avenue residence as Dixon's address. Tr. at 9-12.

3. On September 27, 2012, several law enforcement officers, including Michael Alexander Menzel, Jr., a Special Agent with the FBI, were assigned as the arrest team sent to 10830 Beacon Avenue to execute Dixon's arrest warrant. Tr. at 22-24.

4. The agents arrived at 10830 Beacon Avenue at approximately 6:45 a.m. Tr. at 23-24.

5. Law enforcement officers then knocked on the front door of 10830 Beacon Avenue announcing: "FBI. We have a warrant for Mr. Dixon's arrest. Alvin Dixon, will you please come to the front door." Tr. at 24.

6. Prior to approaching the door at the 10830 Beacon Avenue residence, law enforcement officers believed that Dixon was present at the house because he had been surveilled at the residence the previous day, the black GMC Sierra that Dixon had been seen driving was parked in the driveway, Dixon's driver's license listed the 10830 Beacon Avenue residence as Dixon's address, and Dixon usually left his house after 7:00 a.m. to go to work. Tr. at 20, 27.

7. After the officers knocked on the door, several minutes passed during which officers could hear movement in the house. Tr. at 24-25.

8. One of the officers with the arrest team stationed on one side of the house reported seeing two males inside the house. Tr. at 25.

9. Eventually, a woman later identified as Glenda Dixon (Dixon's wife) came to the front door and told the officers that Dixon was not in the house and that she would not permit officers to enter the residence. Tr. at 26.

10. Later, Glenda was joined by Malik Dermon (Dixon's son) who also stated that Dixon was not in the house and that he would not permit officers to enter the residence. Tr. at 27.

11.     The arrest team then contacted the FBI command post and were informed that information had been obtained that Dixon might be armed with a .45 caliber weapon and to await further assistance before attempting to arrest Dixon.  Tr. at 51-52.

12.     At that point, FBI negotiators arrived and convinced Glenda and Malik to exit the house.  Tr. at 28, 52.

13.     The FBI negotiators then initially convinced Malik to encourage Dixon to come out; however, after consulting with Glenda, Malik changed his mind and said that he would not help the officers.  Tr. at 28-29.

14.     In addition to the information known prior to knocking on the door at 10830 Beacon Avenue, law enforcement officers additionally now knew that one officer had seen two males in the house and Malik, at least implicitly, had confirmed that Dixon was in the house by initially offering to convince him to come out.  Tr. at 27-29.

15.     After Glenda and Malik were cleared of the house, a tactical team entered 10830 Beacon Avenue and performed a protective sweep of 10830 Beacon Avenue (a split-level house with a garage and an unfinished attic).  Tr. at 29; Gov't ##5-7, 21-22.

16.     The attic was accessible only through an access panel in the ceiling of the middle floor, *i.e.*, there were no stairs to the attic.  Tr. at 30, 40, 54-55; Gov't. #12.

17.     The tactical team found no other persons on the ground or middle floor of the house, nor in the garage.  Tr. at 29.

18.     The tactical team observe baggies and a spoon used for measuring drugs in the garage and large amount of cash in an upstairs bedroom.  Tr. at 32, 55-56.

19.     However, on the middle floor, the tactical team noted a hole in the ceiling that appeared to have been made by something falling through (or a person stepping through) the ceiling from the unfinished attic.  Tr. at 29, 42; Gov't. #14.

20.     The tactical team concluded that someone was hiding in the attic.  Tr. at 30.

21.     Out of consideration for officer safety, law enforcement officers decided to utilize a camera to look into the attic.  Tr. at 30, 52-53.

22.     While waiting for the camera to arrive at the scene, officers, including Special Agent Menzel, noted that a hanging light on the front porch of 10830 Beacon Avenue was inexplicably moving around and that the attic extended over the front porch.  Tr. at 31, 54.

23.     When the camera arrived, holes were made in the ceiling of the front porch and middle floor and the camera inserted to look around the attic.  Tr. at 31.

24.     Dixon was shown on the camera hiding in the attic.  Tr. at 31, 53-54.

25. Dixon was ordered to exit the attic through the access panel, which he did and he was then placed under arrest. Tr. at 31-32, 54.

26. After Dixon left the attic, officers performed a sweep of the attic and observed a blue, lunch box-like container with a white powdery substance on the outside. Tr. at 33, 43, 46-47, 56-57; Govt. #23.

27. After being removed the house, Dixon was asked if he would consent to a search of the house and he refused. Tr. at 33.

28. Officers then contacted Special Agent Kenyon and requested that he undertake to obtain a search warrant. Tr. at 33.

29. Special Agent Kenyon prepared an affidavit in support of an application for a search warrant of the 10830 Beacon Avenue residence. Tr. at 14-15, 17; Gov't. #2.

30. The affidavit mentioned the blue, lunch box-like container with a white powdery substance on the outside seen in the attic (but did not mention any currency or other items seen in the residence) specifically stating:

> Officers then conducted a thorough protective sweep of the attic to ensure officer safety as well as the safety of the other occupants of the house. During this protective sweep, officers observed a box-like container that had a white powdery substance on its exterior.

Tr. at 17-18; Gov't. #2.

31. After the search warrant was signed by the Magistrate Judge, Special Agent Kenyon delivered the warrant to the 10830 Beacon Avenue residence. Tr. at 16-17.

32. Once the search warrant arrived, law enforcement officers undertook a search of 10830 Beacon Avenue and seized contraband, including scales, illegal drugs, and more than $112,000 in cash. Tr. at 33-35, 49-50.

# PROPOSED CONCLUSIONS OF LAW

In his motion to suppress evidence seized by officers from his home, Dixon essentially raises two issues, to wit:

(1) The protective sweep of the attic (that uncovered the blue lunch box-like container with white powder on the outside) was not proper inasmuch as the sweep occurred after Dixon had been arrested; and

(2) The currency found by the officers during their initial protective sweep of the house was not in plain sight.

Dixon's arguments fail on both points.

Dixon does not challenge the validity of the underlying arrest warrant. This is critical in that a valid arrest warrant contains authority for law enforcement authorities to enter the residence of the person named in the warrant if: (1) the officers reasonably believe the person resides there, and (2) the officers reasonably believe the person is present when the warrant is executed. *Payton v. New York,* 445 U.S. 573, 603, 100 S.Ct. 1371, 1388 (1980); *United States v. Pruneda*, 518 F.3d 597, 603-04 (8th Cir. 2008); *United States v. Clayton,* 210 F.3d 841, 843 (8th Cir. 2000). Upon legally entering a residence, officers thereafter have the authority to conduct a "protective sweep" of the residence if the officers reasonably believe, based on specific and articulable facts, that the residence harbors an individual who could be dangerous. *Maryland v. Buie,* 494 U.S. 325, 334, 110 S.Ct. 1093, 1098 (1990); *Pruneda*, 518 F.3d at 603-04; *United States v. Walsh,* 299 F.3d 729, 733 (8th Cir. 2002). Such a protective sweep is limited to a cursory inspection of spaces where a person may be found and may not last longer than is necessary to dispel the reasonable suspicion of danger. *Buie,* 494 U.S. at 335, 110 S.Ct. at 1099.

In this case, the record adequately demonstrates that the law enforcement officers were reasonable in their belief that Dixon was in the house at 10830 Beacon Avenue notwithstanding

the contrary statements made his family members. Specially, the officers at the scene were aware that:

- Dixon had been surveilled at the residence the previous day,

- the black GMC Sierra that Dixon had been seen driving was parked in the driveway,

- Dixon's driver's license listed the 10830 Beacon Avenue residence as Dixon's address,

- Dixon usually left his house after 7:00 a.m. to go to work (and the officers arrived at the house prior to 7:00 a.m.),

- one law enforcement officer had seen two males in the house (although only Dixon's son had come out of the house),

- the tactical team noted a hole in the ceiling that appeared to have been made by something falling through (or a person stepping through) the ceiling from the unfinished attic,

- officers noted that a hanging light on the front porch of 10830 Beacon Avenue was moving around and that the attic extended over the front porch, and

- Dixon's son, at least implicitly, confirmed that Dixon was in the house by initially offering to assist officers in convincing him to come out.

Given these facts, officers were entitled to enter the residence at 10830 Beacon Avenue to effectuate the arrest of Dixon. Moreover, the officers thereafter had the authority to conduct a "protective sweep" of the residence because the officers reasonably believed, based on specific and articulable facts, that the residence harbored an individual who could be dangerous. Dixon does not necessarily dispute the foregoing, but instead focuses his argument on the protective sweep of the attic that occurred after he had emerged from the attic and after he had been arrested. Dixon argues that any legal justification for a protective sweep ceased upon his arrest. However, the Eighth Circuit takes a different view:

> A protective sweep is justified by the threat of accomplices launching a surprise attack during an arrest and is particularly important during an in-home arrest, due to the heightened potential for an ambush in unfamiliar surroundings. <u>A protective sweep may be executed after an arrest if there is a reasonable possibility that other persons may be present on the premises who pose a danger to the officers</u>.

*United States v. Davis*, 471 F.3d 938, 944 (8th Cir. 2006) (*emphasis added*) (*citing Buie*, 494 U.S. at 333, 110 S.Ct. at 1098 *and United States v. Jones*, 193 F.3d 948, 950 (8th Cir. 1999)). *See also United States v. Williams*, 577 F.3d 878, 879-80 (8th Cir. 2009) ("Although [the defendant] was handcuffed before the search occurred, a valid protective sweep may be conducted within a reasonable period of time after the subject of the warrant has been arrested."); *United States v. Cash,* 378 F.3d 745, 749 (8th Cir. 2004) ("[A]n officer arresting a suspected drug trafficker in one room of a multi-room residence is justified in conducting a *Buie* sweep out of concern that there could be individuals lurking in the other rooms who may resort to violence to thwart the arrest.").

Under the circumstances of this case, the officers at the scene were justified in performing a cursory protective sweep of the attic where Dixon had gone into hiding in order to evade arrest. Inasmuch as the post-arrest sweep of the attic was justified, it then follows that the officers' plain view observation of the blue lunch box-like container with white powder on the outside was not improper. Correspondingly, the inclusion of the information in the search warrant application was not erroneous. *Compare United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1007 (8th Cir. 2010) ("Having determined that the entry and protective sweep were legal, the information included in the affidavit supporting the search warrant was not illegally obtained and it provided the requisite probable cause to support the search warrant.").

With regard to Dixon's second argument, he contends that the cash observed by officers during the initial protective sweep of the house was not in plain view, but instead was hidden in clothing and a laundry basket. Dixon argues that officers exceeded the scope of a permissible protective sweep by searching areas where Dixon obviously could not be hiding. Even assuming that Dixon is correct that none of the money was in plain sight and that officers exceeded the scope of the protective sweep, suppression is not warranted.

Officers did not seize the currency during the initial protective sweep. Nor did the officers rely upon the presence of the currency in the residence at 10830 Beacon Avenue in obtaining a search warrant for the house. Whatever taint (if any) that may have attached to the currency during the initial protective sweep was purged when the Magistrate Judge issued a valid search warrant without reliance on the discovery of the currency. *Compare Nix v. Williams*, 467 U.S. 431, 443, 104 S.Ct. 2501, 2509 (1984) ("The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation"). As one court reasoned:

> Even though the initial entry of the [the defendant's] address was illegal, no taint attaches to the items found after the Search Warrant was issued as the valid Search Warrant provides an "independent source" for their discovery. Where the information upon which a valid warrant is secured is not derived from the illegal entry of premises, the evidence seized and execution of such a warrant should not be suppressed – the warrant is considered a means of discovery sufficiently independent from the illegal entry to purge the evidence of any taint derived from the illegal entry.

*United States v. Wright*, 2009 WL 2913898, op. at *17 (E.D.Mo. Jun. 29, 2009) (*quoting United States v. Sanchez,* 719 F.Supp. 128, 136 (E.D.N.Y.1989)). Alternatively, the currency is not subject to suppression based upon the principle of inevitable discovery. *Pruneda*, 518 F.3d at

8

604 ("Even if the protective sweep was unreasonable . . . the inevitable discovery exception to the exclusionary rule validated the admission of the evidence.").

Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** the MOTION TO SUPPRESS (Doc. #152) filed April 22, 2013.

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

                                                */s/ John T. Maughmer*
                                                **John T. Maughmer**
                                          **United States Magistrate Judge**